WILLIAM FOX, Plaintiff, *v.* BANKERS TRUST COMPANY and Others, Defendants.*

Supreme Court, New York County, March 5, 1930.

---

* See, also, *Weiss* v. *Fox Theatres Corporation* (136 Misc. 312).

*Hirsh, Newman, Reass & Becker* [*Samuel Untermyer* of counsel], for the plaintiff.

*Hughes, Schurman & Dwight* [*Richard E. Dwight* of counsel], for the defendants Stuart and Otterson.

*Davis, Polk, Wardwell, Gardiner & Reed,* for the defendant Bankers Trust Company.

LEVY, J. This is a motion by the plaintiff, William Fox, for an injunction *pendente lite* (1) restraining the defendants Harry L. Stuart and John E. Otterson from voting his class B stock in Fox Film Corporation and Fox Theatres Corporation and from exercising any other rights pertaining to said stock; (2) enjoining the defendant Bankers Trust Company from granting proxies on

the stock of the plaintiff at present in its possession; (3) prohibiting Stuart and Otterson from performing an agreement between them and the plaintiff, dated December 3, 1929; and (4) restraining all three defendants from preventing the plaintiff from regaining said stock from Bankers Trust Company.

Extreme limitation of time — voluminous affidavits and briefs having been submitted within practically a few hours of the time when a decision becomes imperative — renders it inadvisable, if not indeed impossible, to do more than sketch the outlines of the controversy between the parties. About two years ago Fox Film Corporation and Fox Theatres Corporation entered upon a period of extensive expansion under the personal direction of Fox. Both companies undertook the construction and operation of a number of costly theatres in some of the principal cities of the United States. In addition, many established motion picture theatres were acquired through purchases of capital stock by the Fox companies. Extensive public financing became necessary, and this was accomplished through Halsey, Stuart & Co., Inc., which in the last three years has placed with the public securities aggregating over $48,000,000 and has, besides, made special unsecured loans totalling almost $16,000,000.

During the first half of 1929, through the efforts of the plaintiff, Fox Theatres Corporation acquired 660,900 shares of Loew's, Inc., at a cost of approximately $72,000,000, and Fox Film Corporation contracted for a substantial interest in a chain of English theatres at a cost of about $20,500,000. No permanent financing of the $92,500,000 involved in these commitments was arranged. Instead, the companies resorted to short term loans, the latest maturing on April 1, 1930. Due to a combination of circumstances, including (a) the refusal of the Department of Justice of the United States to sanction the acquisition of the shares of Loew's, Inc., and a threat of a suit under the Clayton Act, (b) a serious automobile accident to Fox which incapacitated him for several months, and (c) the stock market depression in the fall of 1929, the Fox companies found themselves in November of that year owing about $92,000,000, all of which had to be paid or funded in the course of but a few months. Brokerage accounts of Fox and his associates, for which 223,400 shares of Loew's, Inc., was pledged as collateral, required additional margin. It appears from the answering affidavit that this hypothecation of corporate property was effectuated for the benefit of individual obligations of Fox, his family and close friends. Unsecured as well as secured bank loans of both companies were overdue, and others were maturing. Payments had to be made on account of the purchase of various chains of

theatres. A loan of $10,000,000 obtained from Bankers Securities Company of Philadelphia was about to become due. Obviously, a critical exigency existed and the situation demanded prompt action in order to preserve the valuable equities of the Fox companies.

It was with this emergency confronting him that Fox turned for assistance to Stuart and Otterson. The former's company, Halsey, Stuart & Co., Inc., had underwritten and distributed $12,000,000 of notes maturing April 1, 1930, while the latter's concern, Electrical Research Products, Inc., had loaned Fox Theatres Corporation $15,000,000 which would fall due on February 26, 1930. After extended conferences and discussions, during which Fox was represented by most eminent counsel, a written agreement was entered into on December 3, 1929, between Fox on the one hand, and Stuart, Otterson and Fox, " as trustees " on the other. Under this agreement Fox agreed to deposit with Bankers Trust Company, as escrow agent, all his voting stock in both corporations, namely, 50,101 shares of class B stock of Fox Film Corporation (representing a majority of the outstanding B shares), and 100,000 shares of class B stock of Fox Theatres Corporation, constituting all the outstanding B shares of that company. He further agreed that if the trustees worked out a plan of refinancing which required the deposit of his B stock, he would release the same from the escrow arrangement and deposit it under the plan of reorganization, even if that plan involved his loss of voting control of the companies. In addition, he covenanted that he would forthwith deliver to the trustees the resignations of the directors and officers of the companies except his own, as president. The trustees on their part agreed that they would endeavor to prepare a plan of reorganization and that they would in the meantime undertake to negotiate with the creditors and others interested, with a view to obtaining their forbearance and co-operation during the period of the preparation and adoption of such a plan. *Under the agreement no plan of reorganization was to be submitted to the creditors and stockholders for approval until and unless approved as to legal questions by counsel for the trustees, Hughes, Schurman & Dwight.*

In accordance with this agreement, Fox on December 3, 1929, deposited his shares of class B stock of both companies with Bankers Trust Company to be held by it in escrow until at least June 1, 1930, unless the escrow agreement was terminated sooner by notice to that effect furnished by at least two of the three trustees. In the interim Fox appointed Bankers Trust Company his agent " during the life of this escrow " to execute and deliver proxies

running in favor of the trustees, authorizing them or a majority of them to vote at any regular or special meeting of the stockholders of the companies. In reliance upon the execution of the agreement and the resulting escrow of the stock, the trustees at once set to work in an effort to retrieve the situation and obtain the indulgence of the creditors. By the evening of December 6, 1929, the consent of bank creditors whose claims aggregated $6,875,000 had been obtained to forbear until the plan of reorganization had been completed and adopted; Electrical Research Products holding, as has already been observed, a claim of $15,000,000 had agreed to forbear; Bankers Securities Company had agreed to extend its loan of $10,000,000 for three months, and various other creditors, too numerous to mention, had similarly agreed to forbear and co-operate. In addition to this, the trustees had procured loans of about $3,975,000 on the representation that the agreement had been executed and was fully in effect. As a result of their labors, the trustees had only to borrow about $1,500,000 in order to hold the $92,000,000 of current indebtedness until a plan of refinancing could be ultimately adopted. It seems to me that all this had been accomplished on the strength of the execution of the agreement which undoubtedly produced a certain amount of confidence in the creditors and induced them to join in the effort to conserve.

Almost immediately after he signed the agreement, Fox appears to have experienced a change of mind, if not of heart. He declined to honor the trustees' request for the resignations of officers and directors of his companies, as he had solemnly undertaken to do. He promiscuously charged the trustees with having violated various collateral understandings which are not to be found in the written agreement and which the trustees emphatically deny ever existed. He apparently had become apprehensive, and seemingly without provocation, that he might be deposed as president by the trustees, and also that Electrical Research Products might be seeking to acquire the companies and thus " ruin him." He took the position that he would refuse to perform his part of the agreement unless it was modified so as to provide that no plan of reorganization should be adopted which would in any wise disturb his control of the companies through the medium of his voting stock. In other words, having derived a substantial part of the benefit which would flow from the arrangements, he was prepared to repudiate his side of the bargain. His disavowal of the agreement, the execution of which he himself had proclaimed to the public, was so flagrant and unwarranted that the principal executives of his companies joined in a letter to him urging upon him the dishonor

of persisting in such a course and the detrimental effect it would have on the corporations themselves.

The trustees felt that they could not, in justice to the creditors who had relied upon the execution of the agreement in its original form, acquiesce in Fox's breach of his unquestioned obligations thereunder or yield to his demand that the agreement be altered so as to insure his continuance in control. When it became evident that it was futile to treat further with Fox, the trustees called a meeting of the bank creditors and apprised them of the situation which then existed. They indicated that they had been hindered, by the withholding of the resignations and by Fox's refusal to furnish them access to the books and records, in their efforts to prepare and submit a refinancing plan of their own, as contemplated by the very agreement. In the meantime, with a motion pending undetermined in the Federal court for a receivership of the companies, Fox has succeeded in procuring from certain banking interests an agreement on their part to a proposed plan of reorganization. A special meeting of the stockholders of each corporation has been called for this very day, March 5, 1930, one to occur at eleven in the forenoon, and another at a later hour, at which this plan will be submitted for the approval of the stockholders. *The plan has never received the approval of the counsel for the trustees in accordance with the fixed requirement of the agreement of December third, and it is in no way sponsored by them.* In fact they have caused to be prepared a plan for submission to the stockholders which they urge is much more economical for, and beneficial to, the stockholders than that promoted by Fox. The latter, in his effort to bring about the adoption of the plan which he supports has now included Halsey, Stuart & Co., Inc., within the list of those who he claims are aiming, for their ulterior motives, to wrest control of the Fox companies.

It is important to note that Fox owns only approximately five and one-half per cent of the total outstanding capital stock of Fox Film Corporation and something close to eleven per cent of the stock of Fox Theatres Corporation. The remainder of the stock of both companies is owned by the general public. The indebtedness of both companies aggregating in excess of $90,000,000 is also held by the investing public. The significance of these observations rests in the light they throw upon Fox's attempt to create the impression that the companies are his very own, and that any plan which might impair his control of them should be viewed with disfavor and suspicion. It is unnecessary to delve into further detail in respect to Fox's repudiation of his written obligations and his utter disregard of the rights of those who have made sub-

stantial changes in their position in reliance upon his covenants. Suffice it to state that the court is not at all impressed by his disingenuous charges that the agreement was induced by fraud, that it was violated by the trustees, that it was thereafter abandoned by them, and that he is the unfortunate victim of a malevolent conspiracy to seize control of the companies from him for the iniquitous purpose of bestowing it upon Halsey, Stuart & Co. or Electrical Research Products, or both. It is said that of little acorns great oaks do grow. Here we have a little $1,600 acorn which grew into a sturdy $300,000,000 oak. Why was not well enough left alone? The very Fox chopped down this healthy thriving tree with his own hatchet. The world knows much about avarice and cupidity, and I wonder if this is not another illustration. May he now be heard to complain? Has he placed himself in that position which justifies his assault upon the character of men? I think not.

It follows that no cause has been shown to exist for enjoining Bankers Trust Company from issuing proxies to the trustees entitling them to vote the stock deposited in escrow with it, and that there is no basis on the papers before me for otherwise refusing to recognize the binding force of the agreement between the parties. As to the various legal questions of a complex nature which have been raised, it need only be pointed out that no proper opportunity was here afforded to appropriately inquire into them and so they must of necessity be left for the trial of the action. It is only necessary for the purposes of this motion to hold that the plaintiff has completely failed to establish that clear right to an injunction which the law requires on a preliminary application of this character.

The motion is denied and the temporary stay vacated.